**Margaret JENSVOLD, M.D.**

v.

**Donna SHALALA, Secretary, Department of Health and Human Services.**

**Civil A. No. DKC 90–3123.**

United States District Court,
D. Maryland.

March 28, 1996.

Lynne Bernabei, Debra S. Katz, Anne W. Bloom, Deborah Epstein, Bettina Pearl, Michael C. Subit, Bernabei and Katz P.H., Washington, DC, for Margaret Jensvold, M.D.

Lynne A. Battaglia, Kathleen McDermott, Office of U.S. Attorney, Baltimore, MD, for Donna Shalala.

## *MEMORANDUM OPINION*

CHASANOW, District Judge.

■ Margaret Jensvold, Plaintiff, brought this employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* against the National Institutes of Mental Health ("NIMH")[1] alleging that (1) she was denied the full benefit of her fellowship; (2) she was denied the third year of the staff fellowship; and (3) NIMH retaliated against her after she left, all on the basis of gender discrimination.[2] Because of the uncertainty of the application of the Civil Rights Act of 1991, the case was tried before a jury which found, *inter alia,* that (1) mentoring was a benefit of employment as a medical staff fellow that was denied to Plaintiff as a result of gender discrimination causing damage to her professional reputation; and (2) analysis of blood samples after July 12, 1989 was a benefit of employment as a medical staff fellow that was denied to Plaintiff as a result of retaliation causing damage to Plaintiff's professional reputation. The jury awarded $1.00 in nominal damages. After the verdict, but before the court could decide the issues concerning equitable relief, the Supreme Court decided *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and held that the 1991 Act was not to be applied retroactively to alleged acts of discrimination committed before November 21, 1991. Accordingly, the jury's verdict will be treated as advisory only and the court will make findings of fact and conclusions of law

under the statutes as they existed prior to the 1991 amendments. Furthermore, the Fourth Circuit recently decided that Title VII does not apply to former employees. *Robinson v. Shell Oil Co.,* 70 F.3d 325 (4th Cir.1995) (en banc). Thus, Plaintiff's claims arising from alleged conduct after she concluded the medical staff fellowship and ceased being an employee on July 12, 1989 are not cognizable and must be dismissed. The following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## OVERVIEW

■ Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* makes it unlawful for an employer to discriminate against an employee with respect to any of the terms, conditions, or privileges of employment because of the employee's gender or because the employee has filed a complaint of discrimination. To prove intentional gender discrimination, Plaintiff must prove that she was treated differently because she was a woman. To prove retaliation, Plaintiff must prove that she participated in a proceeding protected by Title VII, and that her employer discriminated against her with respect to a term, condition, or privilege of employment *because* of her participation.

■ A successful Title VII sex discrimination case based on a theory of disparate treatment requires proof of discriminatory intent. Plaintiff can satisfy her burden of proof through either direct proof of discriminatory intent, *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), or through the

---

1. The National Institutes of Mental Health was, at the time of Plaintiff's employment, a component of the Alcohol and Drug Abuse and Mental Health Administration ("ADAMHA"), a part of the Public Health Service, which is under the supervision and direction of the Department of Health and Human Services. Since 1992, NIMH has been part of the National Institutes of Health, which is also under the supervision and direction of the Department of Health and Human Services. When referring to the specifics of Plaintiff's employment, "NIMH" will be used. At times, the entire campus and complex is referred to as "NIH."

2. Certain alleged acts in this case were determined to be time-barred because they were isolated employment decisions made before October 15, 1988. They included Plaintiff's claim that Dr. Rubinow "ordered" her into psychotherapy with Dr. Silber in March 1988, and Dr. Rubinow's decision, announced in September 1988, that Plaintiff's medical staff fellowship would not be renewed for a third year. In addition, there is no claim in this case of a generally hostile work environment. The only issue regarding Plaintiff's claim of gender discrimination is whether she was denied the full benefits of her employment as a medical staff fellow.

indirect, burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *McDonnell Douglas* approach consists of three stages of analysis summarized as follows:

> The plaintiff must first make out a *prima facie* case of discrimination. Establishing a *prima facie* case shifts a burden of production to the defendant to present evidence of a legitimate, nondiscriminatory reason for the adverse action. If the defendant produces evidence of such a reason, then the plaintiff must show that the reason presented by the defendant is merely a pretext for discrimination. The plaintiff retains the ultimate burden of persuasion throughout the process.

*Jamil v. Secretary, Dep't of Defense,* 910 F.2d 1203, 1206 (4th Cir.1990).

To be intentional, the discrimination must have been voluntary, deliberate and willful, and not accidental or inadvertent. Plaintiff is not required, however, to produce direct evidence of discrimination. Intentional discrimination may be inferred from the existence of other facts.

In showing that gender or prior EEOC filing was a motivating or determining factor, Plaintiff is not required to prove that it was the sole motivation, or even the primary motivation for the Defendant's decision. Plaintiff need only prove that gender or the prior filing of an EEOC complaint played a part in Defendant's decisions even though other factors may also have motivated Defendant.

There is a threshold question presented by Plaintiff's claims. Not every aspect of an employment relationship constitutes a "term, condition, or privilege" of employment. Sometimes terms and conditions may be set by an employment contract, whether formal or informal, and any such terms promised to an employee as part of the employment contract cannot be withheld on the basis of gender. Furthermore, even if an employer has no contractual obligation to provide employees with a particular benefit, the benefit may become a privilege of employment if it is provided to some employees. Such a benefit—or incident of employment—similarly may not be provided in a discriminatory manner. Thus, the phrase "terms, conditions, and privileges of employment" includes any benefit that was part and parcel of the employment.

Plaintiff cannot contend that she was denied the contractual terms of employment, such as the position and salary. She claims, however, that the Defendant denied her the full benefits of employment as a medical staff fellow at NIMH by denying her mentoring and other supervision, and by denying her the opportunity to work on important biological psychiatric studies, to collaborate and co-author with senior scientists, to attend conferences, to remain at NIMH in some capacity other than a medical staff fellow after the second year so that she could publish the results of her research, to see patients after the termination of her fellowship, to have blood samples analyzed, to have a guest researcher position with Dr. Rubinow or with Dr. Putnam, and to be included as co-author on studies. The jury concluded that all seven items were in fact terms, conditions, or privileges of employment although it concluded that Plaintiff had only been denied three of them.

All alleged terms of employment that post-date Plaintiff's departure cannot, as a matter of law, constitute actionable employment actions in light of *Robinson v. Shell Oil Co.,* 70 F.3d 325 (4th Cir.1995). As a matter of fact, I conclude that mentoring was a benefit of the medical staff fellowship, but that the opportunity to stay on after the fellowship in any capacity other than as a medical staff fellow was not. Nor, were the issue before me as a matter of fact, would I conclude that the opportunity to see patients, the analysis of blood samples, or the inclusion as co-author, all after July 12, 1989, were benefits of the employment relationship. These requests are made available on an ad hoc basis as it suited NIMH and were not promised to the employee.

The next question to address will be whether Plaintiff was denied mentoring as

part of the fellowship. Based on the testimony at trial, I define mentoring as the opportunity to work with a senior scientist on research projects and to receive guidance from the senior scientist on procedures for planning, implementing, recording, and reporting results of the projects. In order to receive mentoring, a fellow has to be assigned to work in the lab of a senior scientist and to have the opportunity to join in the lab's work. She also has to have a chance to talk on a regular basis with the mentor, to ask questions, and to receive feedback on her own work. Plaintiff received mentoring during her fellowship. What she really complains about is that she did not establish as *good* a mentoring relationship as she had hoped. Disappointment of that type cannot be characterized as denial of a term, condition, or privilege of employment. Congress simply cannot legislate that all employment relationships enjoy the best communication or provide the most rewarding learning experience. Title VII can only mandate that employees receive the basic components of the position.

Moreover, the undersigned concludes that whatever deficiencies existed in the relationship between Dr. Jensvold and Dr. David Rubinow were not the result of intentional gender discrimination by Dr. Rubinow, nor even the result of gender stereotyping. Dr. Rubinow treated Plaintiff the same as other fellows and always reacted to her as an individual. There simply is no credible evidence to support Plaintiff's perception that her gender affected that relationship, other than in her own mind.

Hindsight is, in this case, myopic, very far from twenty-twenty. No matter how much magnification is applied to the facts of this case, Plaintiff's version of events remains an illusion. Her skewed perception of events, whether after-the-fact rationalizations borne of a personal sense of failure, or a contemporaneous self-fulfilling prophesy, is entirely of her own creation. Dr. Jensvold was ready to see sinister motive in any action she perceived as remotely critical of her. This is unfortunate, for she obviously had promise as a medical researcher. Instead of trying harder, she sought to lay blame on others.

## EVIDENCE

■ The court heard from many witnesses, including present and former employees at NIMH, friends of Plaintiff, and expert witnesses. The major participants in Plaintiff's experience were Dr. Rubinow, Chief of the Section on Behavioral Endocrinology in the Biological Psychiatry Branch, and Dr. Peter Schmidt. Others in the lab included Dr. Kirk Denicoff, Jean H. Murphy, Gay Grover, Kari Muller, Candace Davis, Chris Berrittini, and Theresa Durkin.

Dr. Kay Deaux testified about sex stereotyping, specifically how stereotypes operate in the environment. She explained that, in her view, people have beliefs on which they may act. For example, a person who believes women are less competent than men will give less important tasks to women. Common stereotypes about women are that they are more dependent and emotional than men, and less competent. Both men and women hold stereotypes. Conditions that often lead to action based on stereotypes include (1) if a woman is a rarity in an organization, (2) if tasks are distributed unequally, (3) if events make gender salient, (4) if decisionmaking is by one person without accountability, and (5) if criteria are not clear. After recounting the materials she reviewed and the facts she found to exist, Dr. Deaux expressed the opinion that stereotypes were being used and applied to Plaintiff. While I found Dr. Deaux's testimony interesting in a general sense, her conclusions were not helpful. One must, as I did as factfinder, consider the entire environment in which language is used to determine its import. Because I find that certain words were not used as alleged by Plaintiff, Dr. Deaux's opinions that stereotyping was afoot must be rejected.

Dr. Leah Dickstein testified about mentoring. She described the core elements of a fellowship including the concept of protected research time. To her, mentoring is close, ongoing supervision, the sharing of research experiences, and encouragement. Meetings should be structured, at least once a week formally, and the relationship should be safe and respectful. Because of the nature of mentoring, and the presence of few women,

she sees barriers to effective mentoring for women. Again, this testimony was helpful in a general sense, but the need to determine the credibility of the witnesses undermines the strength of her characterizations of the essential nature of the mentor relationship.

### Plaintiff's Experience at NIMH

NIMH offers several types of medical fellowships to graduate students. Plaintiff was offered a medical staff fellowship by Dr. Rubinow in the Biological Psychiatry Branch of NIMH beginning in July 1987. The fellowship was for an initial two years, but a one year extension was possible. This fellowship differs from a visiting fellowship, primarily for foreign doctors, and from other programs.

### Application Process and Offer

Plaintiff received her undergraduate degree in 1979 from UCLA in biochemistry, summa cum laude and Phi Beta Kappa. After attending Johns Hopkins University School of Medicine, she received two years of her residency training at the University of Pittsburgh. Dr. Jensvold testified that she had planned a career in medicine, probably in research and science, but, as she completed her undergraduate years, she had not settled on a choice between psychiatry and obstetrics/gynecology. She originally planned to pursue a fellowship in pre-menstrual syndrome ("PMS") after her third year of residency.[3] At a meeting in December 1986, she was encouraged to start her fellowship a year earlier. Plaintiff contacted the University of California in San Diego, The State University of New York at Buffalo, and NIMH. She claimed to have desired a three-year fellowship and testified that she was told by a number of people associated with NIH that fellows who wanted to stay for a third year could do so. Dr. Kaye suggested she contact Dr. David Rubinow, which she did. She interviewed with him March 20, 1987 at NIMH.

On that trip, Plaintiff met several people in the laboratory, including Kari Muller and Dr. Peter Schmidt. In retrospect, Plaintiff claims the latter's manner was gruff and inhospitable. At the time, however, she apparently felt no discomfort because she readily accepted the offer made a day or so later by Dr. Rubinow, after he checked the technicalities and concluded that he could hire another staff fellow. In mid-June, Dr. Rubinow and Plaintiff agreed she would start at NIMH on July 6, 1987. Plaintiff now speculates that there must have been discussions of her history and personal life among the others before her arrival.

Dr. David Rubinow, who first came to NIMH in 1979 and studied under Dr. Robert Post, does not disagree with the timing and basic outline of events leading to Plaintiff's arrival. Dr. Rubinow's first medical staff fellow was Dr. Kirk Denicoff beginning in July 1986, followed by Dr. Peter Schmidt, also that summer. Plaintiff came in July 1987, and Dr. Tung Ping Su began in the Fall of 1989. Others who followed included Dr. Donald Rosenstein and Dr. Maury Tobin. All initially came for a two-year period. Eventually Dr. Rubinow offered a third year to three of them: Schmidt and Rosenstein, who accepted, and Tobin, who could not stay.

Dr. Rubinow learned of Plaintiff through a Dr. Kaye, who notified him that he knew of a resident interested in coming to NIMH for PMS research. At that time, nothing was said of the resident's personal life or that Dr. Kaye had dated her. Dr. Rubinow interviewed Plaintiff in his office in March 1987. They talked about the unit and her interests. Plaintiff also spoke with Drs. Schmidt and Denicoff, and Ms. Berrittini. Dr. Schmidt was favorably impressed; the others expressed reservations. Dr. Rubinow thought Plaintiff was enthusiastic, articulate, bright, and a little anxious. The job was formally offered to Plaintiff shortly after the interview. Dr. Rubinow does not recall when he learned of a disagreement between Plaintiff and the chair of the department at Pittsburgh, but Plaintiff explained the reason for it. Dr. Rubinow categorically denied ever discussing Plaintiff's personal life within the

---

**3.** This corresponds to the fourth year "post graduate" because one year of internship follows

medical school and precedes the residency.

group before or after hiring her, and before her arrival.

Dr. Schmidt recalls interviewing Plaintiff in March 1987, and having a favorable impression. She was pleasant, sociable, and interested in the work they were doing. He thought she would make a reasonable contribution to the group. He knew nothing about her personal life before she arrived. What he learned he learned from her during her first year there. For example, while walking to Wednesday morning rounds, Plaintiff said her marriage had been somewhat traumatic.

Candace Davis recalled interviewing Plaintiff in the Spring of 1987. Afterward, Dr. Rubinow spoke with her and Ms. Berrittini and asked what they thought. Ms. Berrittini expressed some reservations, and Ms. Davis said that Plaintiff was not too chatty or friendly, but that they could work with anyone for two years. Dr. Rubinow summarily mentioned that Plaintiff had had some problems, but whatever they were, they were behind her and would not impact on her ability to do research with them.

Christine Berrittini is a psychologist who worked at NIMH from 1980 until 1989 as a research social worker. She described Dr. Rubinow as a nice, fair person, who was supportive in allowing people to do what they wanted if the work could be accommodated within the goals of the laboratory. She met and interviewed Plaintiff when she was being considered for a fellowship. When asked by Dr. Rubinow, Ms. Berrittini recommended against hiring Plaintiff based on her "gut" feeling that she would not fit in well. No one else was involved in the discussion. She did not have much interaction with Plaintiff once she arrived, although the two did have lunch once in August or September of 1987 when Plaintiff mentioned aspects of her personal life. She denied sharing that information with anyone else.

### Arrival at NIMH

At the initial orientation program, Plaintiff was given a manual that, *inter alia*, explained that fellowships were for two years,

with an optional third year, and after that, any continuation of the fellowship was at the discretion of NIMH. (Plaintiff's Exhibit No. 26).

Plaintiff describes as the first act of discrimination a problem with a parking permit. She claims that she was not properly taught the rules and was accused of being "demanding" and acting "entitled" when she inquired about why she had to share a parking permit with Dr. Denicoff. Allegedly, Dr. Rubinow told her she had to apologize to Sandra Rucker,[4] Dr. Post's secretary, who handled the parking permits for the office. She claims that Dr. Denicoff told her it was no big deal, but Ms. Rucker stopped talking to her. Two months later, Plaintiff claims that Dr. Rubinow brought it up again, stating that he had learned that she had failed to apologize. He said it was still a problem, that she needed to apologize as directed earlier, and apologize to Dr. Schmidt as well.

Sandra Rucker is a budget analyst at NIH. In 1987, her duties included helping to process new medical staff fellows. Parking at NIH is a perennial problem; there are never enough permits. Senior researchers would get the red permits first and the newer fellows always had to share. Those who worked together in the same lab or section were asked to share so that arrangements would be easier. In July 1987, Plaintiff, who was agitated over the fact that she would have to share a permit, went to Ms. Rucker's office. The encounter was sufficiently unpleasant that she mentioned it to Dr. Rubinow. A few days later, Plaintiff went in again and said that it had been suggested that she apologize. Dr. Jensvold said this was not the way to begin our relationship, and it is best to get a fresh start. Ms. Rucker believed they did and does not recall any further discussions about the apology.

According to Dr. Rubinow, Ms. Rucker talked to him about Plaintiff's manner in complaining about the parking permit situation, which offended Ms. Rucker. Dr. Deni-

---

4. At the time of Plaintiff's employment, Dr. Post's secretary was Ms. Sandra Rucker. Ms. Rucker later married and changed her last name to Gault. There was testimony at trial referring to her as both Ms. Rucker and Ms. Gault. For purposes of simplification, she is mentioned here only as Ms. Rucker.

coff, two years Plaintiff's senior, also approached him about the same incident. He discussed the situation with Plaintiff, told her that the other two were upset, and emphasized that it was important to make a good first impression in a new group. Plaintiff began to cry and said she had ruined everything. Dr. Rubinow said that she had not but that she would feel better if she apologized. There was no "order" for Plaintiff to apologize. He does not recall any other mention of the incident.

Plaintiff's recollection does not entirely mesh with the testimony of others and, on balance, I conclude that Plaintiff's version is widely exaggerated and skewed. While obviously some controversy existed over the parking situation, it was not a reflection of general gender discrimination or instigated to cause Plaintiff harm.

### Kiawah Conference

A primary early bone of contention for Plaintiff was the Kiawah conference, held on September 9—13, 1987. Plaintiff says she spoke to Dr. Rubinow on three occasions about the conference, but he was noncommittal. Shortly before the conference, Dr. Schmidt told her it was not important to attend and that she should not unless someone else was paying. Plaintiff did not attend. Afterward, Dr. Schmidt allegedly waxed eloquent about how wonderful the conference had been, that all leaders in psychology and gynecology had been there and that their group had made five presentations, an impressive showing. He downplayed her lament about not going by saying someone in her station should not aspire to such things yet. Plaintiff claims she then confronted Dr. Schmidt about whether he was intentionally excluding her from the conference and was doing the longitudinal study without her. He praised her for coming directly to him, but never got back to her on those concerns. Instead, she heard again about the parking problem.

Again, the recollections of the other participants differ. Dr. Rubinow helped to organize the Kiawah conference and presentations were planned by Drs. Schmidt and Denicoff. He recalls no conversation with Plaintiff about the conference. He neither prohibited nor forbade her to attend. He has never prevented anyone from attending a conference, although he encourages fellows to give priority to data presentation over just attending. He has never attended a conference to network. Plaintiff expressed several complaints about Dr. Schmidt and Dr. Rubinow said it was important for everyone to get along and that he would talk to Dr. Schmidt. He told Dr. Schmidt about Plaintiff's concerns and that both of them had to make an effort to work together.

Dr. Schmidt attended the Kiawah conference in September 1987 and presented an abstract series. He recalled a conversation with Plaintiff, but does not recall whether she asked if she should attend. His experience was that if he was not presenting something, there was no funding. He denied discouraging her from attending and had no authority to decide whether she went or not. After the conference, Dr. Rubinow told him that Plaintiff thought he had been discouraging to her both about the conferences and about courses. Dr. Rubinow told him to work things out with Plaintiff.

Plaintiff has not proven that she was prevented from attending this, or any other conference, and certainly not that any advice she got on this occasion had anything to do with her gender. She attended at least ten conferences and training seminars, all over the United States, in Canada, and one in Amsterdam.

### Treatment in Laboratory

In the Winter of 1987, Plaintiff claims she overheard comments in the laboratory about female researchers/scientists, by Drs. Schmidt and Denicoff, in Dr. Rubinow's presence, that were demeaning to the women and derogatory. After hearing the witnesses, I find that no clearly sexist comments were made and that, in any event, any remarks about other people were not indicative of gender bias against Plaintiff.

Plaintiff also claims there were explicit sexist cartoons and computer screen savers clearly in sight in Dr. Rubinow's office. Starting around Christmas, 1987, a card was displayed on the wall over his desk depicting a physician dressed in camouflage with a

miniskirted nurse on her knees in front with her hands on his chest and her head in his crotch. The doctor had little syringes on his belt and held a large syringe in a phallic position. Dr. Rubinow acknowledges that the card was displayed among many holiday greetings that year, but that until this case, no one had suggested there was a problem and he did not see anything wrong or offensive with it at the time. Plaintiff claims the card was still there in July, an assertion I find dubious.

Later, Plaintiff claims that Dr. Rubinow made sure she was exposed to a photograph of Cheryl Tiegs, allegedly in the center of a target in a suggestive pose. The so-called target actually was a clock face that was part of a screen saver displayed briefly on Dr. Rubinow's computer. Both he and the person who installed it were consistent in their explanation. Ms. Candace Davis was responsible for putting the offending Cheryl Tiegs screen saver on Dr. Rubinow's computer. In the Summer of 1988, she got the program from her husband. The clock face ticks off the time so the screen image changes. Dr. Rubinow does not like to be ruled by a clock so she put the program on his computer as a tease. She did not ask his permission. He did not recall the image being on the screen for more than a fraction of a second when the computer was turned on, and he did not see it as inappropriate.

From the vantage point of the mid 1990's, and in light of the evolving environment of employment discrimination law, these depictions ought not be displayed in a workplace where co-workers or visitors might view them. But that is a far cry from concluding that their display is evidence of gender bias. After hearing all the witnesses, and observing their demeanor, I conclude that Dr. Rubinow did not allow these items to be displayed out of any gender bias, overt or subconscious.

Plaintiff's last day was July 12, 1989. Early in the afternoon, Plaintiff said that an administrative aide told her to turn over her beeper, ID card, and keys immediately. She explained that she needed to keep the keys for a few hours and did not have her ID with her. Twenty minutes later, the person came back and said her response was not acceptable, that she had to turn over her ID and keys immediately. Plaintiff became upset and learned that Dr. Rubinow had contacted the administrator's office several times to make sure the three items were obtained from Plaintiff. Dr. Rubinow testified that he knew she stayed in the lab after the close of business and that he was concerned that the key not remain in hands of unauthorized personnel. Even if he encouraged the administrators to obtain the key from Plaintiff, that is not an indication of gender discrimination or, by itself, a sufficiently serious issue.

### Studies

At Dr. Rubinow's suggestion, Plaintiff discussed the available projects and her interests with Dr. Schmidt shortly after her arrival. She claims to have expressed her desire to work on a longitudinal study and asserts that he told her they could work together. After the Kiawah conference, Plaintiff says she learned he was already seeing patients for a longitudinal study, contrary to what he had told her. Dr. Rubinow assigned Plaintiff to work on at least eight studies in the Fall of 1987: pregnancy and post-partum, trauma and post traumatic stress disorder, asthma, scleroderma, obsessive/compulsive disorder, PMS support group, clonidine, and sleep data. In her view, only the clonidine study was a biological study. Other biological studies underway in Dr. Rubinow's lab at the time included the RU 486 study. In addition, according to Plaintiff, ongoing treatment studies were being conducted, but without her participation. Plaintiff described in detail her work on various studies, and told of her interaction with Dr. Rubinow and others. According to Dr. Jensvold, when she asked Dr. Rubinow in February 1988 to work on long-term trials, he told her it would be a waste of her time; she should instead enjoy her free time.[5]

5. Much trial time was devoted to testimony about specific studies, to prove that those assigned to Plaintiff either were or were not comparable to those assigned to others in terms of importance and contribution to an education in scientific research. The details of that testimony will not be recited here.

Dr. Rubinow described all of his studies as biological, as opposed to psychosocial which he defined as centering on information from surveys and dealing with attitudes and non-biologically driven behaviors. A medical staff fellowship is an opportunity to learn how to do research, to apply the general principles of designing and carrying out a study, and then writing it up. The concepts and techniques of a good study are the same across a whole range of studies. A biological study measures things such as hormones or brain waves, studies processes that are biological, like the menstrual cycle, or has a biological disorder as the focus. A protocol is the recipe for the study, including the justification for undertaking it and the assurance that no patient will be harmed. A study is a specific research question, and a protocol is a proposal for a series of studies and questions. For example, the PMS overview protocol enabled them to bring in patients and obtain measures, giving rise to a number of research questions. It is helpful to some extent to know how to write a protocol. The "principal investigator" is the person generating the protocol and study, frequently the section chief. The assignment of studies in his section is geared to providing an opportunity for fellows both to be involved and to begin their own. Drug or pharmaceutical company involvement in his section was limited to providing a drug and the matching placebo. The advantage to him was to obtain expensive drugs that were otherwise difficult to obtain. The disadvantage was the hoops one had to jump through with the companies. It was not a required part of an NIMH fellowship, and he had no responsibility to arrange for a drug study for every fellow.

A "long-term treatment trial" involves the controlled administration of drugs or placebos to patients over weeks or months. Short-term treatment trials are "challenge studies," lasting several hours during which the researchers watch to see if the patient has an acute response. All other things being equal, Dr. Rubinow prefers short-term trials. They result in more papers. Long-term trials take a tremendous amount of time and many problems can interfere with them and "muddy" the data. The mode of analysis and the mechanics are identical.

Dr. Rubinow also provided detail about the specific projects assigned to Plaintiff.

Plaintiff has not proven that, overall, the studies to which she was assigned differed significantly from those assigned to other researchers in terms of providing the research experience essential to the fellowship. There is, moreover, no evidence that the assignment decisions were based at all on gender. Dr. Rubinow assessed Plaintiff's own progress in determining how much she could take on. Rather, it appears that Plaintiff did not take full advantage of the research opportunities available to her, and any disappointment stems from that failure alone.

### Mentor Sessions

Dr. Rubinow's practice was to set up a mutually convenient time to meet with a medical staff fellow on a regular basis. Other meetings could be arranged as needed, and his door was open when the need arose. The times for his regular meetings with Plaintiff changed. Initially, in the Fall of 1987, they met on Thursday mornings. As of January 1988, the time was Friday afternoons at 3:00 p.m., and the time was changed in late January or early February to 1:00 p.m.

Dr. Rubinow described his interactions with Plaintiff as reasonably cordial. If he learned anything about her personal life, it was because she told him voluntarily. There was some variability in her demeanor. She was not infrequently teary, expressing unhappiness about what was going on in her personal life and at work, specifically mentioning her poor relationship with Dr. Schmidt and her view that Kari Muller was condescending. He denied ever referring to Plaintiff as narcissistic, entitled or demanding or ever stating that no one wanted to work with her because she was competent and attractive. On one or two occasions when Plaintiff's distress was palpable, he suggested that she go into psychotherapy. The first time it came up, Plaintiff said she had been in therapy before.

Plaintiff described the general tenor of the sessions as lacking in structure, providing no formal evaluation except when she got hostile criticism. She asserts that she was never

properly taught how to write protocols or provided sufficient opportunity to co-author publications with Dr. Rubinow.

Both testified about a few specific meetings in starkly different terms. Their different perceptions of the events ought not obscure the fact that the two met regularly to discuss the work being conducted and Plaintiff's contributions to the studies. Indeed, Plaintiff does not contend that she received no mentoring, just that it was deficient.

On March 10, 1988, Plaintiff made her presentation at the journal club, which she thought went very well and on which she received positive feedback from some of the physicians. The next day, during a discussion with Dr. Rubinow, she claims he began a two-hour harangue about how she had treated him during the presentation. More criticism allegedly followed, including statements that people did not like her because she was "competent and attractive" rather than being more dependent on Dr. Rubinow. She also claims that Dr. Rubinow told her she must go into psychotherapy if she wanted to succeed at NIMH and gave her three names of therapists.[6] Plaintiff eventually saw Dr. Earle Silber, one of those recommended.

Dr. Rubinow, on the other hand, testified that he thought Plaintiff's journal club presentation was very bad. He had asked her to make the presentation to him first to practice, but she did not do that. Her presentation was not well-organized, did not identify the questions she attempted to answer, was anecdotal, and lacked cohesion. He felt it was impossible for someone to listen to the presentation and conclude it was other than a mess. He was concerned both that Plaintiff had not reviewed the presentation with him before—no one else, before or since, has failed to do so—and that Plaintiff's poor showing did a disservice to PMS research that was largely denigrated in the field and sorely needed help to be considered important and credible. He even sought advice from Dr. Post to see if his view was shared. Dr. Rubinow shared his view with Plaintiff. He began by stating the things

that were good and then made suggestions based on the problems he saw. Plaintiff became tearful and recounted again her experiences with her father when he refused to support her. Dr. Rubinow expressed concern that because of her prior unfavorable experiences with men, she might come to see him as abusive, and he wanted to see that Plaintiff had a successful fellowship. He recommended that she resume psychotherapy. When Plaintiff expressed curiosity in pursuing the idea, and asked for recommendations, Dr. Rubinow gave her three names. Again, Dr. Rubinow denied yelling at Plaintiff or using the words "entitled, narcissistic, demanding, competent or attractive." It was Plaintiff who said she could not understand why people were jealous of her as she was still in her residency and had few publications. She said her friends told her she was too competent and attractive and that was why she was not liked. Dr. Rubinow assured Plaintiff that the others were not jealous of her.

The next session with Dr. Rubinow was on March 25. Plaintiff wanted to discuss the prior session, an event Dr. Rubinow considered unimportant. After that session, Plaintiff says she changed her appearance by wearing a lab coat at all times and her attitude in that she stopped stating her own opinion.

In the Summer of 1988, Plaintiff received the normal salary increases due to promotion to a second-year fellow and an across the board increase. There was nothing significant in this raise.

Plaintiff began pursuit of an EEO complaint in November 1988. At the November 18 supervision session, Plaintiff testified that she and Dr. Rubinow began discussing why she was feeling relatively better since the March "blowup." The discourse escalated, however, into an analysis by Dr. Rubinow of Plaintiff's problems, including labelling her as abused, and ended with a threat. Later in her testimony, Plaintiff said the quality of the mentoring remained the same afterwards, meaning she saw no improvement.

**6.** This alleged event is not separately actionable, but evidence was presented in the context of the claim of denial of overall mentoring.

The interaction with plaintiff on November 18, 1988 was a shock to Dr. Rubinow. Plaintiff said she wanted to participate in meetings about PMS ideas. He replied that all meetings surround data and there are no other meetings. He did not know where Plaintiff got the idea. Plaintiff then said she wanted to discuss the various ways he had abused her. He asked what she meant. She replied: insisting she go into psychological counseling, by calling her competent and attractive, by expressing concern that her discussion of abuse by her father with her supervisor implied it was the victim's fault. Plaintiff believed the abuse was based on gender. He said he tried to deal with all of Plaintiff's statements in turn. He only later learned of Plaintiff's EEO complaint. In his view, nothing changed. They continued to meet regularly, and he continued to assist with her projects.

As noted at the outset of this opinion, Title VII cannot promise an ideal working relationship, even when mentoring is part of it. The difficulties experienced by Plaintiff do not rise to the level of being deprived of mentoring. She participated in the work of the lab and had the opportunity to learn from the senior scientist. The unfortunate fact that they did not communicate better, or that they differed in their views of the relationship, does not mean that Plaintiff was denied an aspect of the fellowship.

### Third Year and Guest Researcher Position

Plaintiff testified that she approached Dr. Rubinow about a third year of the fellowship in the Summer of 1988. Dr. Rubinow allegedly told her that he would not give her a third year, that he had decided in January 1988 that she would not stay because another fellow was scheduled to arrive in 1991, so he needed another two-year fellow in between. He told her that there were other ways to complete her projects and that this decision was not based on her work. Plaintiff claims she understood at the time that she could stay on in some other capacity.

Dr. Rubinow recalls that just after his vacation in the Summer of 1988, he brought up the subject of the end of her fellowship the next summer. He wanted to be sure Plaintiff knew she had ten months to finish her projects. Plaintiff said she wanted a third year and became tearful, lamenting that she felt like a failure. Dr. Rubinow told her not to feel that way, that the fellowship was for two years, sufficient to provide training so the fellow could go out and do research. He told her that the fellow who would follow her would also be a two-year fellow because Dr. Rosenstein, who had been there as a medical student in 1986 and was to return, was already scheduled to arrive in 1991. As of September 1988, he did not have anything arranged for a new fellow in July 1989. Dr. Su, who eventually arrived after Plaintiff's departure in 1989, was not interviewed until April 1989. Dr. Rubinow recalls no discussion with Plaintiff at that time about her staying on in another capacity and denies telling her he had changed his mind about her third year. He wanted Plaintiff to produce at least one publishable manuscript and to collect data for all her projects so she could write them up after she left.

In the Fall of 1988, Plaintiff claims that she mentioned to Dr. Rubinow that she thought her own studies were undervalued. She said that he agreed, a remark categorically denied by Dr. Rubinow in his testimony. This instance was the first time it became clear to Plaintiff that she would have no opportunity to complete her studies with Dr. Rubinow after July 1989. She began inquiring with other researchers. She said Dr. Post turned down her request because he had to work with Dr. Rubinow. Dr. Putnam said he would take Plaintiff but did not have a slot available. He would allow her to be a guest researcher if she did not find another position. A couple of weeks later, Dr. Putnam advised her that Dr. Brown had a position available in child psychology and Plaintiff should apply. Plaintiff did and interviewed with Dr. Brown. Things went well until Dr. Brown asked how things went with Dr. Rubinow and Plaintiff mentioned the EEOC. He then said it would be too dangerous to take her on because of her EEO complaint against the clinical director. Dr. Gerald L. Brown denies that the discussion occurred that way. Instead, he says he discussed the fellowship with Plaintiff in December 1988. Dr. Brown asked her to call

him if she was available. He never heard from her.

Dr. Rubinow testified that, in February 1989, Plaintiff told him she wanted to be a guest researcher and listed projects she wanted to continue. Dr. Rubinow said he was not sure and asked that Plaintiff provide a written statement of exactly what she wanted to accomplish. He eventually received the list approximately June 16 stating publications Plaintiff felt she should be first co-author on, continued access to secretarial help and the lab, weekly meetings with Dr. Rubinow, library privileges, and computer access. Dr. Rubinow did not give Plaintiff a formal guest researcher position, but agreed to meet with her whenever necessary for data analysis or preparation of a paper. She also could have access to secretaries, the lab, and the computer during day time.[7]

Plaintiff eventually sought to be a guest researcher with Dr. Putnam. Dr. Rubinow played no role whatsoever in Plaintiff's application to be a guest researcher with Dr. Putnam and did not learn of it until November 1989. She asserts, nevertheless, that the processing of her application to be a guest researcher was adversely affected by discrimination. Once again, there is no legitimate support for this belief.

Hazel W. Rea began her employment at NIH in 1949. After "retirement" in 1981, she continued as a reemployed annuitant working half-time. Over the years, her responsibilities increased and she handled the administrative paper work for Plaintiff's request to be a guest researcher in 1989. She recalled getting the investigator's application which Plaintiff had signed on July 17, 1989, and calling Dr. Yarrow who was listed as the person for whom Plaintiff would work. He referred Ms. Rea to Dr. Putnam, whom she

called next. She inquired why Plaintiff would want to come back and work for someone else gratuitously after she had completed a paid fellowship. At the time, Ms. Rea did not know Plaintiff personally, although she knew her name, nor did she know anything about her EEO complaint. According to her, Dr. Putnam said he had checked with Dr. Rubinow and Plaintiff's period as a guest researcher would pose no problem. She approved the position by signing the paperwork on August 17, 1989. She denied making any threats or issuing any warnings in connection with the guest researcher position.

Dr. Putnam, too, denies anything untoward happened during the process. In the Spring or 1989, Plaintiff told Dr. Putnam that she was not going to be extended for a third year. He told Plaintiff that, if she could get permission to continue to see patients, she could have a guest researcher position with him. Dr. Putnam did not discuss Plaintiff with Dr. Rubinow at that point. In order to sign up a guest researcher, he had to obtain several signatures. (Plaintiff's Exhibit No. 71a). Dr. Putnam recalls a conversation with Hazel Rea, who asked whether he knew that there had been trouble with Plaintiff. He responded that he felt he could help Plaintiff and that he wanted her as a guest researcher. Ms. Rea said "fine." The papers were signed. He did not feel threatened or warned and denied saying to Plaintiff that any threats or warnings were issued.

Plaintiff was able to stay on as a guest researcher, but her official employment ended on July 12, 1989. The later events might have some relevance in assessing whether any adverse employment actions occurred during her fellowship. It is not necessary, however, to delineate the evidence in detail.[8]

---

7. After Plaintiff's fellowship ended, he provided her with recommendations on how to analyze and present data on the clonidine study, how to analyze and interpret the second clonidine study, and he had assays performed at NIMH expense. He had no formal obligation to continue to help Plaintiff, but the data was no good unless brought to public attention; he thought the data was worthy of that attention and wanted to see Plaintiff be able to produce publications.

8. According to Dr. Putnam, he arranged to meet with Plaintiff regularly to schedule patients and

to go over data. In reality, he met with Plaintiff only a few times in July, August, and September, and only once in October when Plaintiff stopped coming until April 1990. In the interim, some meetings were scheduled, but cancelled by Plaintiff. In his view, his efforts to teach Plaintiff how to put data together into usable format met with only limited success. At the meeting in April 1990, he received notes outlining what Plaintiff intended to do for two papers. He never received a draft paper from Plaintiff during her

Dr. Rubinow never said during Plaintiff's employment that she could not have access to him or resources to complete her projects. While he never agreed to afford her a formal guest researcher position, he was not really given the appropriate chance to do so. She did not submit the written information until very late in her stay, and Dr. Rubinow did not think that her plans necessitated a formal position. Furthermore, Dr. Rubinow did not interfere in any way in Plaintiff's discussions with others concerning other positions. The opportunity to stay on at NIMH, in a position other than as a medical staff fellow or as a guest researcher, remains an amorphous issue. Plaintiff certainly did not prove that such opportunities were benefits of employment, or that an opportunity was withheld from her on a discriminatory or retaliatory basis.

### CONCLUSION

When the smoke clears from the years of litigation and animosity, it is easy to see that Plaintiff's claims lack substance. Given the current scope of Title VII, the only issue properly before the court is whether Plaintiff was denied mentoring or any benefit of employment as a part of her medical staff fellowship from July 1987 to July 1989 as a result of gender discrimination or retaliation. For the reasons stated above, she has not proven that she was denied mentoring, or that any other employment actions were either benefits of employment or denied to her because of intentional gender discrimination or retaliation. It follows that judgment will be entered in favor of Defendant and against Plaintiff on all claims.

guest research position. No draft was received from July 1990 to December 1991.

At a conference in Chicago in October or November 1989, Plaintiff presented an abstract on the trauma study. Dr. Putnam sat in and critiqued her performance afterwards. He thought she had problems listening to questions from the audience. He denied being unavailable to Plaintiff for any length of time during the guest researcher time and could always schedule time to meet. Near the end of the year, Plaintiff asked for a renewal. He declined because there were a limited number of guest researcher positions and he had several working on abused children. Furthermore, Plaintiff had not accomplished any of her goals; there was no evidence of increased productivity.