**Timothy WEAVER, Relator,**

v.

**MINNESOTA VALLEY LABORATORIES, INC., Commissioner of Jobs and Training, Respondents.**

**No. C6–90–2563.**

Court of Appeals of Minnesota.

May 14, 1991.

Stacy A. Broman, Hottinger Law Offices, Mankato, for Timothy Weaver.

Thomas P. Donnelly, Jr., New Ulm, for Minnesota Valley Laboratories, Inc.

Hubert H. Humphrey, III, Atty. Gen., James Patrick Barone, Sp. Asst. Atty. Gen., St. Paul, for Com'r of Jobs and Training.

Considered and decided by AMUNDSON, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

HUSPENI, Judge.

Relator Timothy Weaver seeks review of a decision by the Commissioner of Jobs and Training denying his claim for unemployment compensation benefits. The Commissioner concluded that Weaver should have complained to higher level management before quitting his job as a result of sexual harassment by his supervisor. We affirm.

## FACTS

Timothy Weaver began working as a full-time microbiologist for respondent Minnesota Valley Testing Laboratories, Inc. (MVTL) in November 1989. Weaver's supervisor was Kate O'Connor, the microbiology lab manager. Weaver and O'Connor shared an office until approximately March 1, 1990.

When Weaver was hired, he received a copy of MVTL's sexual harassment policy, which stated:

Any employee who believes that she, or he, has been subject to * * * harassment, is encouraged to report it to the EEO [Equal Employment Opportunity] Officer (Fred Day) for prompt investigation and action. Each employee involved will be given opportunity to tell their version of the facts, after which the EEO Officer will take appropriate actions depending on the situation.

Weaver resigned from MVTL on April 11, 1990, alleging he had been sexually harassed by O'Connor. Weaver filed a claim for unemployment compensation benefits with the Department of Jobs and Training (Department), but his claim was denied on the basis that he had voluntarily quit his job without good cause attributable to MVTL.

Weaver appealed to a Department referee, who conducted a hearing. During the course of the hearing, Weaver testified that O'Connor had discussed with him her drinking and sexual activities and fantasies. She also asked Weaver questions about sexual topics, and remarked on his sexual relationship with his wife. Weaver was offended by O'Connor's comments, and was very uncomfortable with the situation. According to Weaver, O'Connor's comments affected his work and made him feel "degraded and terrible * * * under duress." At the end of January, Weaver confronted O'Connor and stated that he did not appreciate her remarks. O'Connor shrugged off his complaints.

In early January 1990, Weaver and his wife attended MVTL's Christmas party. At that time, Weaver's wife spoke with MVTL's Chief Executive Officer and EEO Officer, Fred Day. Weaver's wife complained to Day that O'Connor was treating Weaver unfairly. Day did not follow up on the matter because the complaint was made by an employee's spouse.

On January 30, 1990, O'Connor submitted to Weaver a list of areas in which she expected him to improve. Weaver told Day that O'Connor was not treating him in a professional manner and that he could not understand why O'Connor was questioning his work. Day assessed the problem as a personality conflict between two professionals, and an inability by Weaver to accept O'Connor as a supervisor because she was a woman.

Day testified that he did not initiate an investigation of sexual harassment because Weaver made no such claim. It is Weaver's position, however, that he complained to Day about the sexual harassment.

Two of Weaver's co-workers testified that sex was discussed in the work place. One of the co-workers testified that everyone in the lab occasionally made sexual comments, including O'Connor.

Following the hearing, the referee found, in part:

[Weaver] initiated a conversation with the chief executive officer, [Day] and complained to the effect that the supervisor was not treating him in a professional manner and that he couldn't understand why his work activity was being questioned. [Day] assessed the situation as a personality conflict between professionals and also as an inability of the claimant to accept a female supervisor. The employer's personnel policy imposes on [Day] the duty to investigate and take appropriate action when a sexual harassment matter is called to his attention. He initiated no such action as a result of the * * * meeting [with Weaver] because no such matter was mentioned by the claimant.

However, despite its findings that Weaver did not mention sexual harassment to Day, the referee determined that Weaver voluntarily quit his job with good cause attributable to MVTL, due to sexual harassment by O'Connor. The referee reasoned that Weaver had made his objections known to O'Connor, and that her knowledge of the harassment must be imputed to MVTL.

MVTL appealed the referee's decision to a Commissioner's representative, who concurred with the referee that no report of sexual harassment had been made by Weaver to Day, but who reversed the referee's determination that knowledge of O'Connor must be imputed to MVTL. The Commissioner's representative concluded:

The claimant's failure to discuss the asserted sexual harassment by his immediate supervisor with Fred Day, or with anyone else in authority, precludes our finding that the employer knew or should have known of the existence of the harassment.

Weaver has obtained a writ of certiorari, seeking review of the Commissioner's representative's decision.

## ISSUES

1. Does the record support the Commissioner's representative's finding that Weaver did not complain to Fred Day about the sexual harassment?

2. Must O'Connor's knowledge of the harassment be imputed to MVTL?

## ANALYSIS

### I.

An employee is disqualified from receiving unemployment compensation benefits if his separation from employment was voluntary and without "good cause attributable to the employer." Minn.Stat. § 268.09, subd. 1(a) (Supp.1989). Sexual harassment constitutes good cause attributable to the employer if the employer "knows or should know of the existence of the harassment and fails to take timely and appropriate action." *Id.*

■ The parties do not dispute that O'Connor's communications to Weaver constituted sexual harassment, that Weaver confronted O'Connor and expressed his disapproval of her conduct, and that MVTL took no action to resolve the problem. The parties, however, dispute whether MVTL knew or should have known of the harassment.

■ On appeal, we must review the decision of the Commissioner's representative, rather than that of the referee. *See Chellson v. State Div. of Employment & Sec.*, 214 Minn. 332, 335, 8 N.W.2d 42, 44 (1943). We employ the following standard of review:

This court will review the commissioner's fact findings in the light most favorable to the decision below and will not disturb them if there is evidence reasonably tending to sustain those findings. * * *

The commissioner's conclusions of law, however, do not similarly bind us.

*Ress v. Abbott Northwestern Hosp., Inc.,* 448 N.W.2d 519, 523 (Minn.1989) (citations omitted).

Weaver challenges the finding of both the referee and the Commissioner's representative that no complaint about sexual harassment was made to MVTL's EEO Officer, Fred Day. While it is possible that another fact-finder may have reached a different determination on this record, our scope of review is narrow. Indeed, a different fact-finder may have found a need for greater sensitivity on the part of one in Day's position when the complaints were brought by a male employee about a female supervisor (perhaps a posture not often recognized historically as one involving sexual harassment). A different fact-finder might have determined that Weaver's failure to use the actual words "sexual harassment" in the context of complaints about a female supervisor was understandable and that the complaints made were sufficient to require further inquiry by Day. The testimony by Day that he believed Weaver was unable to accept O'Connor as a supervisor because she was a woman may have caused a different fact-finder to assess Weaver's complaint and Day's lack of response in a manner other than the actual fact-finders did in this case. However, because the record contains support for the determinations here that Weaver provided Day with no "specifics" about harassment, said nothing to Day about O'Connor's sexual comments, and that Day gathered from his conversation with Weaver that there was a "personality conflict" between Weaver and O'Connor, we must affirm the findings of the tribunals below.

## II.

Weaver next argues that because O'Connor was a first level supervisor with management authority, the referee properly determined that O'Connor's knowledge of the harassment should be imputed to MVTL and that the Commissioner's representative erred in ruling that Weaver should have reported the harassment to Fred Day.

The legislature has indicated that an employee has good cause to resign if an employer knows or "should know" of the existence of sexual harassment. Minn.Stat. § 268.09, subd. 1(a). In determining the legislature's intent when employing the phrase "should know," we are guided by the following policy:

> [T]he unemployment compensation statute is remedial in nature and must therefore be liberally construed to effectuate the public policy of Minn.Stat. § 268.03 (1980) that unemployment reserves be used "for the benefit of persons unemployed through no fault of their own."
> * * * For this reason the disqualification provisions of the statute are to be narrowly construed.

*Smith v. Employers' Overload Co.,* 314 N.W.2d 220, 221–22 (Minn.1981) (citations omitted).

There is superficial appeal to adoption of a bright-line rule that would impute to an employer the knowledge of a harassing supervisor that sexual harassment was occurring.[1] The justification for such a rule would lie, arguably, in the fairness of requiring an employer to be wise, cautious and prudent in deciding which of its employees should be given supervisory duties. The opportunity for harassment—sexual or otherwise—when supervisory authority is vested in an unworthy person, is great. However, we believe a bright-line rule would place an unacceptable burden upon employers, such as MVTL, who have conscientiously instituted a written policy regarding reporting of sexual harassment. By so doing, these companies have identified, by name or position, the one individual to whom reports should be made, regardless of whether the harasser be a fellow employee or a supervisor. A bright-line

---

**1.** While *McNabb v. Cub Foods,* 352 N.W.2d 378 (Minn.1984) ruled that knowledge of an immediate supervisor that an employee was being harassed by fellow employees would be imputed to the employer, that case did not address the issue of such imputation when the supervisor was the harasser.

rule would undercut such commendable efforts to a great extent. Of course, employers with written policies requiring reporting of sexual harassment have a continuing duty to assure that the person to whom reports are to be made is a person of sufficient sensitivity to listen and act appropriately on those reports.

Inasmuch as we have declared the inappropriateness of a bright-line test which would always impute to the employer knowledge of a harassing supervisor, we are required to approach the issue on a case-by-case basis. In *Heaser v. Lerch Bates & Assoc., Inc.*, 467 N.W.2d 833 (Minn.App.1991), this court concluded that an employee, prior to resigning, had no duty to complain further of harassment by a regional manager. In *Heaser*, the employer's upper-level management officials were headquartered in Colorado. Even more important, in *Heaser* the harassing supervisor was the identified EEO officer to whom reports of harassment were to be made. The Commissioner in *Heaser* found good cause to quit attributable to the employer and this court affirmed. In this case, the Commissioner found no good cause attributable to the employer and we affirm that decision also. We believe that MVTL's written policy regarding reporting of sexual harassment, the identification of Fred Day as the officer to receive such reports and, ultimately, the fact that Weaver not only knew about the policy and knew the identity of the officer to whom to report, but had, in fact, reported other matters to him, all serve to distinguish this case from *Heaser* and support the Commissioner.

Finally, we believe our affirmance of the Commissioner in this case is consistent with *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) which declined to issue a definitive rule on employer liability for harassment in Title VII employment discrimination actions.[2]

## DECISION

The Commissioner's representative did not err by concluding Weaver was required to complain to a specified officer in higher level management before quitting his job.

Affirmed.

**2.** We note that the *Meritor* case involved a suit by an employee for money damages against an employer based on sexual harassment by a supervisor. It did not arise in the context of an action for unemployment compensation. While in the past we have distinguished between misconduct for unemployment compensation purposes and "cause" to fire an employee and might therefore also distinguish between notice of harassment for unemployment compensation purposes and notice for other purposes, such as suit for money damages against the employer, we do not believe such a distinction to be sharp enough to permit us to disregard the concerns enunciated in *Heaser* that there might be occasions where "company policy arguably limits authority of a manager such that his errors must be reported to other company officials."