United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

Nos. 97-1126 and 97-1220
_____

| | | |
|---|---|---|
| Lori A. Todd, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Ortho Biotech, Inc., | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  October 20, 1997
Filed:   March 5, 1998
_____

Before RICHARD S. ARNOLD, Chief Judge, LOKEN and HANSEN, Circuit Judges.
_____

LOKEN, Circuit Judge.

Ortho Biotech, Inc. ("Ortho"), appeals a judgment in favor of its former employee, Lori Todd, on her claims of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1988), and the Minnesota Human Rights Act ("MHRA"), MINN. STAT. §§ 363.01 *et. seq.* (1982).  Concluding that Ortho took timely and appropriate action to remedy another employee's attempted rape of Todd at a national sales meeting, and that such action is a complete defense to her claims under Title VII and the MHRA, we reverse.

We summarize the facts as found by the district court. On September 21, 1992, Todd was a sales representative, or product specialist, working for Ortho's Minnesota regional office and attending Ortho's national sales meeting in Boston. After a full day of conferences, Todd stopped at the hospitality suite, where she agreed to go to a jazz club with two other product specialists and James Moreland, Ortho's Director of Trade Relations. The group later went to a local bar, where Moreland drank shots of vodka and exchanged sexually oriented jokes with Todd. Back at the hotel, their companions returned to the hospitality suite, leaving Todd and Moreland alone in an empty elevator. Moreland grabbed Todd and attempted to kiss her but she pushed him away, asking "What are you doing?" Moreland apologized and suggested Todd accompany him to his room for a complete apology. Todd said that was unnecessary, but complied when Moreland persisted, fearful of upsetting a high-ranking Ortho official. Once inside the room, Moreland overpowered Todd, pinned her to the bed, and attempted to rape her. When Todd began hyperventilating, Moreland allowed her to escape from the room.

The next evening, Todd reported the attack to another product specialist, who urged her to report the incident to Charles Ball, Ortho's Director of Management Development. Todd approached Ball the next morning and asked for a private meeting, without telling him she had been attacked. Ball agreed to meet at the end of that day's conferences. Todd attended the scheduled meetings that day, including a skit she found sexually offensive. She met Ball in her hotel room that evening, told him about the attack and, at his urging, also told Craig Mangean, Director of Employee Relations. Ball was shocked and sympathetic. Mangean told Todd that she had a right to inform the police, but she declined to do so. She said that Mangean could tell the company attorney of the incident but asked that Moreland's superiors not be informed. At Todd's request, Ball and Mangean accompanied her to dinner. After dinner, Todd reported the incident to her immediate supervisor, Division Manager John Hess. She returned to her room, where she received a brief phone call from Moreland. Todd reported the call to Ball, who offered to move her to another room. She declined,

saying she felt safe in her own room.  Todd returned to Minnesota the next day, where she later obtained medical attention, including treatment for depression and anxiety.

Officials at Ortho's headquarters in New Jersey contacted Moreland promptly after receiving Todd's complaint and confronted him early the following week with Todd's accusations.  Moreland denied assaulting Todd and claimed he was being targeted because he is an African-American. After a three-week investigation, Ortho discharged Moreland but gave him a severance package worth over $100,000 in exchange for his release of all claims against Ortho, including Title VII claims.

Todd commenced this lawsuit in June 1993 and ceased working for Ortho in March 1994.  The district court tried her Title VII claim to a jury, which awarded Todd $128,000 for lost earnings and $90,000 for emotional distress.  Her MHRA claim was tried to the court, which awarded Todd $524,000 -- consisting of three times the jury's lost earnings award, $90,000 for mental suffering, and a $50,000 fine to the State of Minnesota -- plus $217,440.26 in attorneys' fees and costs.  Ortho appeals, contending that it is not liable for sexual harassment under either Title VII or the MHRA because it took prompt and effective action in response to Moreland's misconduct.

## I.  The Title VII Claim

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of sex.  42 U.S.C. § 2000e-2(a)(1).  "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Meritor Savings Bank v. Vinson, 477 U.S. 57, 66 (1986).  "For sexual harassment to be actionable," the Court explained, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 67 (quotation omitted).  In this case, Ortho quite properly concedes that an attempted rape at a national sales meeting is sufficiently severe

misconduct to be actionable sexual harassment. The issue, then, is whether Ortho is liable for Moreland's misconduct.

In this circuit, to prevail on a claim of hostile work environment sexual harassment, a plaintiff must prove that she was a victim of unwanted harassment based upon her sex that affected a term, condition, or privilege of employment, *and* that the employer knew or should have known of the harassment and failed to take proper remedial action. See Callanan v. Runyun, 75 F.3d 1293, 1296 (8th Cir. 1996). However, the district court did not apply that standard. Relying on authority from other circuits, the court instructed the jury that a different standard applies if the harassing co-worker, here Mr. Moreland, was a "supervisor." Instruction No. 37 stated:

> An employer is liable for the sexual harassment committed by its supervisor if the supervisor used his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of his supervisory powers. *In such a case, the employer cannot escape liability by taking some after the fact remedial action.*

(Emphasis added). On the other hand, Instruction No. 40 advised the jury that, if Moreland was not a supervisor, Ortho would only be liable if Todd proved that Ortho knew or should have known of Moreland's harassment and failed to take prompt and effective remedial action to stop it. The jury's special verdict found that Ortho knew of Moreland's actionable harassment, that Ortho did *not* fail to take prompt and effective remedial action, but that Ortho is liable because Moreland used his authority and position with Ortho to further the harassment.

Since the district court's decision, we have clarified that the court erred in not applying our normal hostile work environment standard. Even when the hostile environment was created by a supervisor's sexual harassment, the employer is not liable unless it "knew or should have known of the harassment yet failed to take proper remedial action." Davis v. City of Sioux City, 115 F.3d 1365, 1368 (8th Cir. 1997);

-4-

see <u>Spencer v. Ripley County</u>, 123 F.3d 690, 691 (8th Cir. 1997). In <u>Davis</u>, we reversed and remanded for a new trial because the district court instructed the jury that knowledge of a high-level supervisor's sexual harassment should be imputed to the employer. Knowledge is not the issue in this case. Rather, the error here is more far-reaching, for it deprived the employer of a complete defense -- that it took timely and appropriate remedial action to correct serious, one-time misconduct occurring outside the workplace -- merely because the offender was a "supervisor" who had no direct authority over the victim. We conclude Instruction No. 37 was reversible error.

As we noted in <u>Davis</u>, 115 F.3d at 1367, a supervisor's liability is imputed to the employer in cases of "quid pro quo" sexual harassment, where sexual favors, for example, are directly linked to the grant or denial of an employment benefit.[1] In urging us to affirm, the EEOC as amicus argues that we should adopt the imputed liability standard used in quid pro quo cases for hostile environment sexual harassment claims when the harasser is a supervisor. Interestingly, this is a different standard than the agency urged the Supreme Court to adopt in <u>Meritor</u>. <u>See</u> 477 U.S. at 70-71. The Court in <u>Meritor</u> said it is "wrong" to "impose absolute liability on employers for the acts of their supervisors, regardless of the circumstances of a particular case." 477 U.S. at 73. The EEOC argues that its proposed rule would not violate this principle because "an employer would not be liable, without notice, where, even though the harasser was a supervisor, he was not in the victim's chain of command or had no authority over her employment." But that contention is inconsistent with the district court's instruction in this case, which only required the jury to find that Moreland was an Ortho supervisor, not that he was Todd's supervisor. The fact is that Moreland was not in Todd's "chain of command" when he assaulted her, which leaves the EEOC's support of Todd's position with little credibility.

---

[1]This principle is of no help to Todd in this case because the district court denied her tardy attempt to amend her complaint to assert a claim of quid pro quo harassment, and she has not challenged that ruling on appeal.

Viewing the question more broadly than the facts of this case, we think it contrary to both the intent of the statute and principles of agency law to impose liability upon an employer for the wrongful act of a supervisor acting well beyond the scope of his duty, particularly when the harassment complained of is a one-time act committed outside the workplace that the employer could not have anticipated. A strict liability standard will not encourage employers to promulgate anti-sexual harassment policies. A rigid standard of imputed liability will discourage employers from aggressively investigating complaints of sexual harassment by supervisors, complaints which, if proven true, will only redound to the employer's financial detriment. And such a standard fails to encourage and reward employers for taking prompt and effective remedial action to discipline sexual harassment offenders and to restore for the victim a workplace free of such discrimination. Thus, the strict liability standard is inconsistent with the statute's ultimate goal, which is to eliminate sex discrimination, not simply to "point a finger at deep pockets upon the incident of harassing behavior." Jennifer L. Johnson, Employment Law -- Are Employers Strictly Liable for Supervisor Sexual Harassment in the Fifth Circuit [etc.], 38 S. Tex. L. Rev. 965 (1997).

Ordinarily, we would remand for a new trial of the Title VII claim, as in Davis. However, here the jury expressly found that Ortho took proper remedial action after learning of Moreland's harassment. We have reviewed the record and conclude that finding is well supported by the trial evidence. Because Todd failed to prove this essential element of a hostile work environment claim, we reverse this portion of the judgment and direct that judgment be entered dismissing her Title VII claim. See Glasser v. United States, 315 U.S. 60, 80 (1942).

## II. The MHRA Claim

Unlike Title VII, the MHRA expressly prohibits sexual harassment in employment. See MINN. STAT. §§ 363.01, subd. 14; 363.03, subd. 1(2)(c). The statute also defines sexual harassment to include:

conduct or communication [which] has the purpose or effect of substantially interfering with an individual's employment, public accommodations [etc.]; and in the case of employment, [when] the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.

MINN. STAT. § 363.01, subd. 43 (emphasis added). Thus, when we shift our consideration of the supervisor harassment issue to Todd's MHRA claim, we begin with the proposition that Minnesota law is consistent with our Title VII decision in Davis -- "[a]n employer may escape liability for its supervisor's acts of sexual harassment if it takes timely and appropriate remedial action." Fore v. Health Dimensions, Inc., 509 N.W.2d 557, 561 (Minn. App. 1993). To our knowledge, the Minnesota Supreme Court has not addressed this issue, but it has adhered to the plain meaning of this portion of the statute in cases of co-worker harassment. See McNabb v. Cub Foods, Inc., 352 N.W.2d 378, 381-82 (Minn. 1984). We believe that Court, like the Minnesota Court of Appeals, would allow employers the "timely and appropriate remedial action" defense in cases of supervisor harassment, at least in a case such as this where Moreland was not Todd's direct supervisor and the one-time harassment occurred outside their normal workplace. We reject as contrary to the plain language of MINN. STAT. § 363.01, subd. 43, the district court's conclusion that Ortho is liable under the MHRA because Moreland used his authority or position with Ortho to further his sexual harassment.

We must therefore turn to the district court's alternative MHRA holding, that Ortho is liable because it knew of Moreland's harassment and did not take timely and appropriate remedial action. Without question, Ortho had almost immediate knowledge of Moreland's sexual assault. Todd reported the assault to Ball, Mangean, and Hess within forty-eight hours of the incident, and those managers received and acted on her complaint on behalf of Ortho. Thus, we need not explore an issue that has troubled the Minnesota courts, namely, under what circumstances knowledge of sexual harassment may be *imputed* to an employer because the harasser was a supervisor. Compare

Giuliani v. Stuart Corp., 512 N.W.2d 589, 595 (Minn. App. 1994), with Weaver v. Minnesota Valley Labs., Inc., 470 N.W.2d 131, 134-35 (Minn. App. 1991). Imputing knowledge of Moreland's after hours misconduct to Ortho seems unrealistic, but in any event Ball's prompt response to Todd's complaint two evenings later makes the initial timeliness of Ortho's remedial actions a non-issue.

The real issue of course is whether Ortho took appropriate remedial action when Todd complained of sexual harassment by Moreland, an issue the jury resolved in Ortho's favor. The jury's finding should have resulted in the dismissal of Todd's MHRA claim for two reasons: first, MHRA claims should be tried to the jury in federal court, see Kampa v. White Consolidated Indus., Inc., 115 F.3d 585, 586 (8th Cir. 1997); and second, the jury's finding on an issue common to both claims is in any event conclusive, see Bush v. Marshalltown Medical & Surgical Center, 123 F. 3d 1130, 1132 n.2 (8th Cir. 1997). However, Ortho did not preserve these issues in the district court.

In determining whether an employer with knowledge of sexual harassment has taken "timely and appropriate remedial action," the Minnesota courts have focused on three specific types of potential remedial measures -- whether the employer has acted to discourage sexual harassment before it happens, for example, by disseminating a sexual harassment policy or establishing a well-publicized procedure for resolving such complaints; whether the employer has acted to alleviate the victim's plight, for example, by transferring her to another shift or job site; and, perhaps most importantly, whether the employer has adequately investigated the complaint and taken suitable disciplinary action against an offender. See McNabb, 352 N.W.2d at 384; Fore, 509 N.W.2d at 561; Schlitz v. Holiday Co., 1996 WL 653974, at *4 (Minn. App. 1996).

In this case, Ortho had a published policy against sexual harassment. After hearing Todd's complaint, Ball and Mangean expressed shock and sympathy, asked Todd what she would like them to do, offered to move her to another hotel room, and

helped her return home. In Minnesota, Ortho offered to pay Todd's uninsured therapy costs (which she declined); urged her to move her therapy day to a work day, with full pay; and granted her substantial paid leave. Ortho's senior management confronted Moreland when he returned from the sales conference, investigated Todd's complaint thoroughly, and fired Moreland when Todd's complaint was found to be credible. These actions are similar to employer responses the Minnesota courts have found to be timely and appropriate remedial action. See Fore, 509 N.W.2d at 561; Schlitz, 1996 WL 653974 at *4.

The district court concluded that Ortho did not take timely and appropriate remedial action primarily for three reasons: its investigation of Todd's complaint took thirty days, Moreland was given a valuable severance package when terminated, and Todd's subsequent requests for transfer and additional leave were not accommodated. In our view, these facts do not justify rejecting the jury's finding of timely and appropriate remedial action. When confronted, Moreland vigorously denied Todd's allegations. He accused Ortho of race discrimination when it credited Todd's version of the events in question and threatened litigation if he was terminated. Ortho cannot be faulted for carefully investigating two conflicting versions of a serious incident that could not be independently corroborated. As Judge Edith Jones explained in Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987):

> Since the demise of the institution of dueling, society has seldom provided instantaneous redress for dishonorable conduct. . . . Ordinarily, an organization requires time to respond to embarrassing, emotional and often litigation-spawning claims of sexual harassment. Careers and corporate image rest on the company's handling of such charges. . . . [O]ne cannot reasonably demand the employer to ignore its experience with the alleged offender or to examine a charge of sexual harassment based on one side of the story, in a vacuum.

Likewise, we do not fault Ortho for its decision to buy peace with Moreland with a severance package. By terminating this high-ranking minority employee with two

decades of experience and no complaints on his record on the ground that he sexually harassed a relatively new employee, Ortho showed its commitment to preventing sexual harassment in its workplace, not timidity in the face of controversy. See Sims v. Brown & Root Indus. Servs., Inc., 889 F. Supp. 920, 930-31 (W.D. La. 1995), aff'd, 78 F.3d 581 (5th Cir.) (table), cert. denied, 117 S. Ct. 68 (1996). Finally, Ortho's failure to accommodate Todd's later requests for a transfer from Minnesota to Houston and for a lengthy personal leave, and her complaint that some at Ortho treated her as a "non-person," cannot nullify Ortho's timely and appropriate remedial action in response to her complaint of sexual harassment. These subsequent events occurred months after the Moreland assault and were the basis for Todd's separate Title VII claim of unlawful retaliation. The jury found that Ortho did not retaliate.

The judgment of the district court is reversed and the case is remanded with instructions to enter judgment dismissing the complaint. Because Todd is no longer a prevailing party, the district court's award of attorney's fees must be vacated. See 42 U.S.C. § 2000e-5(k); MINN. STAT. § 363.14, subd.3.

RICHARD S. ARNOLD, Chief Judge, concurring.

The Court rightly cites, as one of the principal authorities justifying its decision, Davis v. City of Sioux City, 115 F.3d 1365 (8th Cir. 1997). I dissented in that case, id. at 1369, but I am now bound by it. I therefore concur in the opinion of the Court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-