Jody **HENDERSON,** Plaintiff,

v.

**HEARTLAND PRESS, INC. and David Whitlatch,** Defendants.

No. C97–4086–PAZ.

United States District Court,
N.D. Iowa,
Western Division.

Oct. 13, 1999.

Randall E. Nielsen, Pappajohn, Shriver, Eide, Nicholas, Mason City, IA, for plaintiff.

John C. Gray of Heidman, Redmond, Fredregril, Patterson, Plaza & Dykstra,

L.L.P., of Sioux City, IA, for defendant Heartland Press, Inc.

Paul D. Lundberg of Shull, Cosgrove, Hellige & Lundberg, Sioux City, IA, for defendant Whitlatch.

## MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY

ZOSS, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .............. 993
II. STATEMENT OF FACTS ....... 993
III. LEGAL ANALYSIS ............. 997
   A. Standards for Summary Judgment .................. 997
   B. Heartland's Motion for Summary Judgment on Henderson's Title VII and Iowa Civil Rights Act Claim ..................... 998
   C. Defendants' Motions for Summary Judgment on Henderson's Claim Under the Violence Against Women Act ..................... 1000
   D. Motions to Exclude Expert Testimony ................ 1002
IV. CONCLUSION ................ 1002

### I. INTRODUCTION

This case was commenced with the filing of a complaint on September 26, 1997 (Doc. No. 1). In the complaint, the plaintiff, Jody Henderson ("Henderson"), alleged Heartland Press, Inc. ("Heartland"), her employer, and David Whitlatch ("Whitlatch"), a co-employee and her superior, were liable to her for sexual harassment in violation of Title VII of the Civil Rights Act of 1969, 42 U.S.C. § 2000e–2(a), and Chapter 216 of the Iowa Code (1995) (Count I), and for violating the Violence Against Women Act, 42 U.S.C. § 13981 (Count II). On February 18, 1998, the parties consented to jurisdiction over the case by United States Magistrate Judge Paul A. Zoss (Doc. No. 9). On March 13, 1998, the court dismissed the Title VII claim against Whitlatch (Doc. No. 12).

On April 7, 1999, Heartland filed a motion for summary judgment (Doc. No. 26), challenging both counts in the complaint. In the motion, Heartland also asked the court to exclude the testimony of Heartland's listed expert witnesses, Arnold D. Silberman and K. David Hirschey, "because the testimony is not reliable and will not assist the jury." Henderson resisted the motion on May 3, 1999 (Doc. No. 34). On May 25, 1999, Whitlatch filed a motion for summary judgment (Doc. No. 46), which was resisted by Henderson on June 25, 1999 (Doc. No. 55). Also on May 25, 1999, Whitlatch joined in Heartland's motion to exclude expert testimony (Doc. No. 49). On June 25, 1999, Henderson moved to exclude the testimony of Mark J. Schouten, an expert witness listed by Whitlatch (Doc. No. 57). The motion was resisted by Whitlatch on June 30, 1999 (Doc. No. 58).

These motions came on for hearing on July 1, 1999. Randall E. Nielsen appeared for Henderson, Sarah J. Kuehl and John C. Gray appeared for Heartland, and Paul D. Lundberg appeared for Whitlatch. After the hearing, Heartland and Henderson filed supplemental briefs and exhibits (Doc. Nos.62–65). The court now considers these motions to be fully submitted.

### II. STATEMENT OF FACTS

Except where noted, the following facts are not in dispute. In July 1996, Henderson was employed by Heartland as a laborer in the bindery department. Whitlatch was the production foreman for the bindery department. Although Whitlatch was not Henderson's supervisor,[1] he worked directly with her on a daily basis. Whitlatch's immediate superior was Lisa Albrecht ("Albrecht"), the vice president of production and the second-in-command at Heartland. Patrick Van Arnam ("Van Arnam") was president. Nancy Johnson

---

1. Henderson's supervisor was John Smith, and Smith's immediate superior was Whitlatch.

("Johnson") was the human resources manager.

There is no evidence Whitlatch had engaged in any sexually inappropriate conduct toward Henderson or anyone else while employed at Heartland before July 14, 1996, when the events which gave rise to this lawsuit occurred. There is also no evidence anyone else at Heartland had engaged in any sexually inappropriate conduct toward Henderson.

In the early morning hours of Sunday, July 14, 1996, Henderson left her home and drove to Heartland to begin working the 5:00 o'clock a.m. shift. As she drove away from her home, she noticed she was being followed by another vehicle. When she arrived at the Heartland parking lot, she determined that the other vehicle was being driven by Whitlatch. Whitlatch approached Henderson's vehicle and told her to get into his car so they could talk. Henderson complied, and Whitlatch drove out of the parking lot. As he was driving, Whitlatch told Henderson he had been drinking. He then ask her if she was having problems with her weight.[2] After Henderson denied any problems with her weight, Whitlatch told her he was having problems with his wife, and stress from his job was making things worse.

Eventually, Whitlatch drove Henderson to a secluded location, where he parked his vehicle. He told Henderson he had heard she was going to quit work to go to school and that he did not want her to do so. Whitlatch said he could make arrangements for her to work another shift if she wanted to go to school. Henderson responded that she wanted to remain on the weekend shift so she could go to school during the week. Whitlatch responded that he was the head of the bindery department, and if Henderson ever wanted to work another shift, he would make sure it happened. At some point during this conversation, Whitlatch began rubbing Henderson's leg. Then, in the words of Henderson:

[A]ll of a sudden he just grabbed me in the back of the head. And he said, I just have to do this. And just kissed me. And I had stuff in my hands. And then I pushed him with my shoulder like that. And then he said, do you want to go back? I said, yes. He drove me back. It was about 5:30.

Doc. No. 38, Ex. 1 at 48–49.

On the way back to Heartland, Henderson had no further conversation with Whitlatch, but she began to cry. After arriving at Heartland, Henderson got out of Whitlatch's vehicle and went to the bindery department, where she saw her sister, Jorja, who also worked at Heartland. Henderson started crying again, and her sister took her home. Henderson never returned to Heartland, nor did she ever speak with Whitlatch again, or with anyone else representing Heartland's management. Later that Sunday, Henderson called the telephone number for Heartland's "employee assistance program" and reached a recording. Henderson never followed up.

On the morning of July 15, 1996, Johnson, Heartland's human resource manager, learned of the incident and told Van Arnam, Heartland's president. Van Arnam then asked Whitlatch what had happened. Whitlatch admitted he had been drinking. He told Van Arnam he had heard through the grapevine that Henderson was trying to lose weight and that she was already anorexic, and he wanted to talk to her about it. He picked up Henderson in the parking lot and drove her around, and eventually parked his car. Whitlatch "felt really bad for her" because she was starting to cry, so he put his arm around her and tried to give her a hug. Van Arnam told Whitlatch he should not have done that. Other than putting his arm around her, Whitlatch denied touching Henderson, but he said he did not remember if he had kissed her. Whitlatch told Van Arnam he then drove Henderson back to Heartland. Doc. No. 29, Ex. B at 42.

2. Henderson had a history of anorexia, and Whitlatch was aware of this fact.

At 4:00 p.m., Van Arnam and Johnson met with Henderson's sister, Jorja Henderson, and her mother, Mary Henderson. This is the only time before the filing of this lawsuit that Heartland's management heard Henderson's version of the events of July 14, 1996. According to Johnson's notes of the meeting, the Hendersons gave the following description of the events of the previous day:

Jodi [sic] left home at 4:30 on Sunday morning by herself for work. Jodi [sic] noticed a car following her. She pulled into work and it turned around and stopped behind her. It was Dave Whitlatch and he wanted to talk with her. He told her to get into the car so they could talk about work. They drove around and went out on a country road to talk. She said that he was stressed out with work. (Dave had been drinking a lot.) He talked about her wanting to quit and how he wanted her to at least remain on a part-time status while going to school. He said he was having troubles at home. (Jorja said or she had heard talk) He also stated that he had heard Jodi [sic] wanted to lose an additional 10 to 15 pounds. (He touched her knee). Then he said that he had tried to catch her before work last week to talk. (Jorja stated that she and Jodi [sic] always ride together.) Then at one point he said he had to do this and reached over to try and kiss her. Jodi [sic] responded by pulling away from him. He apologized for this. When they got back to the plant it was about 5:30am. Dave told Jodi [sic] that he guessed she would be a little late for work. If Jodi [sic] needed a leave of absence it would be granted. In the meantime Jorja was very concerned because her sister[']s car was at work and she was nowhere to be found. When Jodi [sic] did come in she went into hysterics when she saw her sister.

They told [the third shift supervisor] that they had to go home.

Doc. No. 38, Ex. 5. According to Van Arnam, at the conclusion of the meeting, he suggested to the Hendersons that Jody contact him "so that we can hear from her what happened." [3] Doc. No. 38, Ex. 5 at 51. Jorja told him Jody was still upset and would not be coming to work that day, and Van Arnam was left with the impression Jody would not be returning to work for awhile. *Id.* at 48.

As Johnson was typing her notes from the meeting, Whitlatch came into her office and asked what had happened. Johnson responded by asking Whitlatch if he had been drinking at the time of the incident, and he said he had. Johnson told Whitlatch that the Hendersons said he had tried to kiss Jody, and he responded that he did not remember. He said he had a drinking problem and was "thinking about getting dried out." He also expressed concern about his job and whether he was going to be fired. Johnson told him she was going to write him up for this incident and suggested he contact the employee assistance program about his problems. Whitlatch said he would, and he later called her and said he had set up a meeting with the program. In his deposition, Whitlatch admitted he never followed through with the employee assistance program.[4]

On July 22, 1996, Van Arnam and Johnson wrote the following letter to Mary and Jorja Henderson:

At the outset, we both appreciate your bringing to our attention the problem that Jodi [sic] Henderson had with David Whitlatch. As you probably realize, if problems arise at work of which we are not notified, there is little we can do to rectify any such problems. That is why we appreciate your bringing this

---

**3.** Johnson also tried, unsuccessfully, to talk to Jody about the events of July 14, 1996. Doc. No. 29, Ex. D at 31; Ex. C at 17.

**4.** According to Heartland, the records of the employee assistance program are confidential between the employee and the program.

possibly embarrassing situation to our attention.

Following your July 16th meeting with us, David Whitlatch was confronted by Nancy Johnson. Following that meeting, we feel appropriate action has been taken with Mr. Whitlatch, which includes his participation in the Employees' Assistance program.

We both will follow through with Mr. Whitlatch's course of dealing with this situation.

We understand Jodi [sic] has taken a leave of absence. We both wish to stress that Jodi [sic] may return to Heartland Press on a full or part-time basis—at her choice. Jodi [sic] has been an excellent employee.

If any of you have any questions about this letter or comments, you should definitely not hesitate to contact either on[e] of us. Further, should any other incidents arise of this nature, we urge that you report them immediately, again to either or both of us.

Doc. No. 29, Ex. J.

On July 30, 1996, Whitlatch was given a written warning signed by Van Arnam and Johnson which stated, in part:

At best, you exhibited a lack of judgment, especially in view of today's standards regarding harassment. We also commend you for availing yourself of the Employee Assistance Program and urge you to follow through with any recommended treatment or therapies. We definitely wish to see you clear up any personal problems you might have, as you are a valued employee.

We both are confident you will understand, however, that we must give you a warning that the type of behavior you apparently exhibited to Jodi [sic] Henderson cannot be tolerated. A subsequent, provable incident of this nature will result in further disciplinary action by representatives of Heartland Press, Inc.

Doc. No. 29, Ex. I.

According to Van Arnam, this is the only sexual harassment claim that has ever been made against Heartland.[5] At the time of the incident, Heartland had a written policy against sexual harassment.[6]

Although there is no evidence Whitlatch had sexually harassed anyone at Heartland prior to the July 14, 1996 incident, he admitted at his deposition that a sexual harassment claim had been made against him in 1991 or 1992, before he worked at Heartland. According to Whitlatch, the

5. There was, however, a prior incident where an employee complained about inappropriate jokes.

6. Harassment of any kind will not be tolerated at Heartland Press, Inc. Harassment is defined as a continuing pattern of unwelcome slurs, jokes, and other verbal, graphic or physical conduct relating to an individual's race, color, sex, religion, national origin, citizenship, or disability. Harassment also includes sexual advances, requests for sexual favors, offensive touching, and other verbal graphic, or physical conduct of a sexual nature.... Examples of Sexual Harassment Are:
1. Deliberate, repeated, unsolicited verbal comments, gestures, or physical actions of a sexual nature (e.g., touching, pinching, or patting.)
2. Explicit or implicit promise of career advancement, training, awards, lax timekeeping, or low standards of performance in return for sexual favors.

3. Explicit or implicit threats that if the sexual demands are rejected, the victim either will receive a poor performance appraisal or will be reassigned to a less desirable position/location.

The policy also contains a complaint procedure that directs a victim of harassment to take a series of steps in response to offensive conduct or language. First, the employee is to advise the person engaged in the offensive conduct that the conduct is offensive and must stop immediately. Second, the victim is to discuss the matter with his/her supervisor, management, or the Employee Assistance counselor. Third, the victim may discuss the problem with anyone with whom he/she feels comfortable, "especially" his/her supervisor. Fourth, "Heartland does not condone harassment and, as such, takes complaints seriously. Please be at liberty to contact Pat Van Arnam, Nancy [Johnson], or your Employer Assistance counselor." (Doc. No. 29, Ex. F.).

claim involved improper jokes and language, and led to a lawsuit against Whitlatch, his employer and another employee. Whitlatch paid a thousand dollars to settle the claim and was asked to leave by his employer. According to Whitlatch, he advised Heartland of this prior incident at the time he was hired.

In the fall of 1996, Henderson enrolled as a full-time student at Iowa Lakes College in Spencer, Iowa.

## III. LEGAL ANALYSIS

### A. Standards for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment and provides that either party to a lawsuit may move for summary judgment without the need for supporting affidavits. Fed.R.Civ.P. 56(a) & (b). Rule 56 further states that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(c) (emphasis added). "A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, . . . and give [the nonmoving party] the benefit of all reasonable inferences that can be drawn from the facts." *Lockhart v. Cedar Rapids Comm. Sch. Dist.,* 963 F.Supp. 805, 814 (N.D.Iowa 1997) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). A genuine issue of material fact is one with a real basis in the record. *Lockhart,* 963 F.Supp. at 814 n. 3 (citing *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56).

The party seeking summary judgment must " 'inform[ ] the district court of the basis for [its] motion and identify[ ] those

portions of the record which show lack of a genuine issue.' " *Lockhart,* 963 F.Supp. at 814 (quoting *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992)); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden under Rule 56 of showing there is no genuine issue of material fact, the nonmoving party, "by affidavits or as otherwise provided in [Rule 56],[7] must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e); *Lockhart,* 963 F.Supp. at 814 (citing *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356).

Addressing the quantum of proof necessary to successfully oppose a motion for summary judgment, the United States Supreme Court has explained the nonmoving party must produce sufficient evidence to permit " 'a reasonable jury [to] return a verdict for the nonmoving party.' " *Lockhart,* 963 F.Supp. at 815 (quoting *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Furthermore, the Court has held the trial court must dispose of claims unsupported by fact and determine whether a genuine issue for trial exists, rather than "weigh the evidence and determine the truth of the matter." *Lockhart,* 963 F.Supp. at 815 (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53; and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56).

Thus, if Heartland or Whitlatch shows no genuine issue exists for trial, and if Henderson cannot advance sufficient evidence to refute that showing, then Heartland or Whitlatch, or both, as applicable, is entitled to judgment as a matter of law, and the court must grant summary judgment in their favor. If, on the other hand, the court "can conclude that a reasonable trier of fact could return a verdict for [Henderson], then summary judgment should not be granted." *Lockhart,* 963

---

7. *E.g.,* by "affidavits ... supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Fed.R.Civ.P. 56(e).

F.Supp. at 815 (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510)

Special care must be given to summary judgment motions in employment discrimination cases. As the Honorable Mark W. Bennett stated in *Moland v. Bil–Mar Foods,* 994 F.Supp. 1061, 1065–66 (N.D.Iowa 1998):

> The court has often stated that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1204 (8th Cir.1997) (citing *Crawford* ); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir.1997) (quoting *Crawford* ); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford* ); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir.1997) (quoting *Crawford* ); *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand,* 827 F.2d at 364). Consequently, summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; see also *Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at

1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244).

Keeping these standards in mind, the court now will address the defendants' motions for summary judgment.

## B. Heartland's Motion for Summary Judgment on Henderson's Title VII and Iowa Civil Rights Act Claim

Heartland argues it is entitled to summary judgment on Henderson's Title VII and Iowa Civil Rights Act claim in Count I of the complaint. In Count I, Henderson alleges Heartland's conduct, as set forth above, constitutes sexual discrimination and sexual harassment in violation of 42 U.S.C. § 2000e–2(a), and the Iowa Civil Rights Act. She also alleges the conduct constituted *quid pro quo* sexual harassment. Finally, she alleges the conduct resulted in a hostile work environment that was sufficiently severe and pervasive to alter the conditions of her employment in violation of 42 U.S.C. § 2000e–2(a).[8]

In *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court announced the standards for deciding whether an employer is vicariously liable for a supervisor's sexually harassing conduct. In doing so, the Court held the labels *"quid pro quo"* and "hostile work environment" no longer are controlling for purposes of establishing employer liability. *See Newton v. Cadwell Lab's,* 156 F.3d 880, 883 (8th Cir.1998); *Ellerth,* 118 S.Ct. at 2265, 2270–71; *Faragher,* 118 S.Ct. at 2292–93. As the Eighth Circuit Court of Appeals explained in *Newton:*

> Putting these so-called labels aside, the Court held that when a supervisor's sexual harassment of an employee results in a tangible employment action such as

8. Iowa courts have followed federal case law in applying and interpreting the Iowa Civil Rights Act for sexual harassment claims. *See Noble v. Monsanto Co.,* 973 F.Supp. 849, 854 (S.D.Iowa 1997); *Lynch v. City of Des Moines,* 454 N.W.2d 827 (Iowa 1990). Henderson alleges violation of Title VII along with violation of the Iowa Civil Rights Act. Both the federal and state claims will be treated as one and discussed in the context of federal case law.

discharge, demotion, or undesirable reassignment, the employer is vicariously liable to the employee. See *Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at ——–——, 118 S.Ct. at 2292–93. The Court also held that when no tangible employment action is taken, the employer will be vicariously liable to "a victimized employee for an actionable hostile environment created by a supervisor[,]" unless the defending employer can prove by a preponderance of the evidence a two-pronged affirmative defense to liability or damages. *Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2270; see *Faragher,* 524 U.S. at ——–——, 118 S.Ct. at 2292–93.

.... Because Newton's claim does not involve either fulfilled threats or other detrimental employment action resulting from her refusal to submit to [her supervisor's] sexual overtures, Newton's claim "should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." *Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2265.... [T]he absence of a detrimental employment action allows [the employer] to present an affirmative defense if Newton can show [her supervisor's] conduct was sufficient to create a hostile work environment. See *Ellerth,* 524 U.S. at ——, ——, 118 S.Ct. at 2265, 2270. Because the district court did not determine whether Newton established that [her supervisor's] behavior was severe or pervasive sexual harassment, we are unwilling to assume discrimination cannot be proved and remand this case to the district court to give Newton the opportunity to show she has a claim for which [her employer] is liable. See *Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2271. *Newton,* 156 F.3d at 883–84.

In the present case, the sexual harassment of Henderson did not result in a tangible employment action such as discharge, demotion, or undesirable reassignment. Therefore, Henderson's claim should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct. *See id.* In order to make out a *prima facie* case for an actionable hostile work environment, Henderson must establish the following:

(1) she belongs to a protected group;

(2) she was subject to unwelcome sexual harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer knew or should have known of the harassment and failed to take proper remedial action.

*See Phillips v. Taco Bell Corp.,* 156 F.3d 884, 888 n. 4 (8th Cir.1998); *Todd v. Ortho Biotech, Inc.,* 138 F.3d 733, 736 (8th Cir. 1998); *Davis v. Sioux City,* 115 F.3d 1365, 1368 n. 5 (8th Cir.1997). In its brief, Heartland conceded, for purposes of its motion for summary judgment, that Henderson could establish the first four requirements, but Heartland contested both the fourth and fifth requirements. Because the court concludes Henderson cannot prove the fifth requirement, the court will not deal with the fourth requirement.[9]

9. The record also establishes that the harassment did not affect a term, condition, or privilege of Henderson's employment. For purposes of Title VII, the phrase "terms, conditions, and privileges of employment" includes any benefit that was part and parcel of employment. *Jensvold v. Shalala,* 925 F.Supp. 1109 (D.Md.1996). Henderson's employment remained unchanged prior to the incident and after the incident. However, Henderson chose to cease attendance at work and eventually enroll in a community college. (Doc. No. 29, Ex. A at 30–31) During Henderson's absence, her job remained open. (Doc. No. 29, Ex. B at 61; Ex. C at 43). Her attorney also was informed that efforts would be made to allow Henderson to change her schedule, move to a different part of the plant, or take other steps to minimize contact with Whitlatch. (Doc. No. 29, Ex. K; Ex. C at 34–38). The harassment clearly did not affect a "term, condition, or privilege" of Henderson's employment.

Henderson argues Heartland knew about the July 1996 incident involving Whitlatch, and about Whitlatch's previous sexual harassment history at his prior employment, yet failed to take any substantial remedial action following the July 1996 incident. (Doc. No. 41 at 9) Heartland asserts it became aware of the situation between Whitlatch and Henderson only after it occurred, and immediately took proper remedial actions. (Doc. No. 27 at 11)

■ The record indicates Heartland had no knowledge of any harassment of Henderson by Whitlatch, or by anyone else, before the incident of July 15, 1996. After learning of the incident, Heartland promptly investigated the allegations by interviewing Whitlatch and speaking with Henderson's mother and sister. After the investigation was complete, Heartland began taking remedial action against Whitlatch. Heartland also held open Henderson's job, offering to transfer Henderson if she preferred, and to create modified work schedules so contact between Whitlatch and Henderson would be minimal.

■ An employer has many options for exercising its remedial obligations, including: taking disciplinary action to stop the harassment; transferring the alleged harasser to a different area where he or she would not come in contact with the complainant; scheduling the individuals involved on different shifts; putting a signed written warning or reprimand in personnel files; or placing the offending employee on probation pending any further complaints. *Hathaway v. Runyon,* 132 F.3d 1214, 1224 (8th Cir.1997). The law does not require an employer to fire the alleged harasser. *Id.; Barrett v. Omaha Nat'l Bank,* 726 F.2d 424, 427 (8th Cir.1984). Placing a disciplinary letter in the alleged harasser's file is a prompt remedial action, "reasonably calculated to end the harassment." *Id.*

In the present case, Heartland began investigating the matter on the Monday following the Sunday incident. Company officials spoke with Whitlatch about his conduct, and he was informed that his conduct was inappropriate and unacceptable. Verbal warnings were given to Whitlatch indicating any such behavior would not be tolerated in the future, and he would be subject to further disciplinary action, including termination. A written disciplinary statement, which stated further incidents similar to Henderson's allegations would result in further disciplinary action, was placed in Whitlatch's personnel file. (Doc. No. 29, Ex. I). In addition, Whitlatch's behavior was monitored through regular meetings during the months following the incident, in an effort to detect continuing or additional issues. Summary judgment was granted to an employer in a similar case, where the employer placed a written warning in the alleged harasser's personnel file indicating future acts would lead to additional disciplinary action including termination. *See Zirpel v. Toshiba Am. Information Sys., Inc.,* 111 F.3d 80 (8th Cir.1997).

Heartland took adequate remedial action as a matter of law. Therefore, Henderson cannot prove the fifth required element for an actionable hostile work environment claim. Heartland is granted summary judgment on this issue. Because the Iowa civil rights claim against Whitlatch is based upon the same facts and legal theory, Whitlatch also is granted summary judgment on that issue.

## C. Defendants' Motions for Summary Judgment on Henderson's Claim Under the Violence Against Women Act

Heartland and Whitlatch both argue they are entitled to summary judgment on Henderson's claim in Count II of the complaint under the Violence Against Women Act, 42 U.S.C. § 13981. The Violence Against Women Act, 42 U.S.C. § 13981(b), creates a federal civil rights cause of action for victims of crimes of violence motivated by gender. Any person who commits a crime of violence motivated by gender and thereby deprives the victim of the federal civil rights created by the act is liable to

the party injured in an action for the recovery of compensatory and punitive damages. 42 U.S.C. § 13981(c).

■ Whitlatch argues he did not commit a crime of violence against Henderson which would support liability under the Violence Against Women Act. The Act defines a "crime of violence" as:

An act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction. . . .

42 U.S.C. § 13981. Henderson asserts Whitlatch committed a "crime of violence" against her by committing felonious kidnapping under subsection 710.1(3) or (4) of the Iowa Code.[10] Iowa law provides:

A person commits kidnapping when the person either confines a person or removes a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

. . . .

3. The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.

4. The intent to secretly confine such person.

Iowa Code § 710.1(3) & (4) (1978). Whitlatch forcibly kissed Henderson without her consent, but did not inflict serious injury on her. Therefore, for Whitlatch's conduct to constitute kidnapping under subsection 710.1(3) of the Iowa Code, his conduct must have been accompanied by an intent to subject Henderson to sexual abuse or to secretly confine her.

Sexual abuse is defined in the Iowa Code as, "Any sex act between persons . . . when the act is performed with the other participant . . . by force or against the will of the other." Iowa Code § 709.1(1) (1984). Henderson argues Whitlatch's kiss was forced upon her, and therefore was done with an intent to subject her to sexual abuse. However, a kiss does not constitute a "sex act." See Iowa code § 702.17 (1989).[11] Therefore, Whitlatch's conduct did not rise to the level of sexual abuse. Furthermore, an intent to sexually abuse cannot be inferred from his conduct. After the alleged kiss, Whitlatch asked Henderson if she wanted to go. Henderson said yes, and Whitlatch returned her to work promptly. Those actions do not display an intent to sexually abuse. Therefore, Henderson's claim under subsection 710.1(3) is meritless.

Henderson also argues Whitlatch is guilty of kidnapping under subsection 710.1(4) of the Iowa Code, because she claims Whitlatch tried to secretly confine her. Not every incidental confinement or every trivial movement from one place to another warrants a kidnapping conviction. See State v. Folck, 325 N.W.2d 368, 371 (Iowa 1982). It is true Whitlatch drove around with Henderson and took her to a

---

**10.** In Henderson's complaint (Doc. No. 3), she also alleges Whitlatch committed assault in violation of her individual rights under Iowa Code § 708.2C(3). However, violation of subsection 708.2C(3) is an aggravated misdemeanor, so it could not satisfy the felony requirement of the Violence Against Women Act.

**11.** The term "sex act" or "sexual activity" means any sexual contact between two or more persons by: penetration of the penis into the vagina or anus; contact between the mouth and genitalia or by contact between the genitalia of one person and the genitalia or anus of another person; contact between the finger or hand of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 150, 150A, 151, or 152; or by use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

secluded location, but when Henderson asked Whitlatch to take her back to Heartland, he promptly did so. Therefore, Henderson's car ride with Whitlatch does not constitute confinement under the "kidnapping by secret confinement" statute. Henderson's claim against Whitlatch under subsection 710.1(4) also is without merit.

To entertain a claim under the Violence Against Women Act, acts which constitute a felony must occur. Whitlatch did not commit a felony against Henderson; therefore, Henderson does not have a valid claim under the Violence Against Women Act. Whitlatch is granted summary judgment as to this claim.

Henderson claims Heartland is liable for Whitlatch's alleged misconduct because Whitlatch was acting within the scope of his employment with Heartland. However, as stated above, Henderson does not have a valid claim against Whitlatch under the Violence Against Women Act. Therefore, it follows that Henderson does not have a valid claim against Heartland under the Violence Against Women Act. Heartland is granted summary judgment as to this claim.

### D. Motions to Exclude Testimony

All parties have moved to exclude expert testimony. Because of the court's rulings on the motions for summary judgment, these motions are denied as moot.

## IV. CONCLUSION

Based upon the foregoing analysis, defendants' motions for summary judgment are granted, and the motions of the parties to exclude expert testimony are denied as moot.

**IT IS SO ORDERED.**